UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

v.

MARVIN CHARLES GABRION, II,

        Defendant.
                                       /

File No. 1:99-CR-76

HON. ROBERT HOLMES BELL

## **O P I N I O N**

        Defendant Marvin Gabrion was convicted of first degree murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111 and 18 U.S.C. § 7.[1]

---

[1]Title 18, section 1111 provides in pertinent part:

    (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree. . . .

    (b) Within the special maritime and territorial jurisdiction of the United States, Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life.

18 U.S.C. § 1111. The "special maritime and territorial jurisdiction of the United States" is defined to include:

    (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State . . . .

    (3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof . . . .

18 U.S.C. § 7.

The Court imposed a sentence of death pursuant to 18 U.S.C. § 3594 in accordance with the jury's recommendation. Defendant appealed his conviction. The appeal is still pending. This matter is currently before the Court on a limited remand from the Sixth Circuit Court of Appeals for such further proceedings as the Court determines are appropriate to fully develop the record on subject matter jurisdiction. *United States v. Gabrion*, Nos. 02-1386/1461/1570 (6th Cir. Apr. 6, 2006).

**I.**

Defendant was convicted of murdering Rachel Timmerman. Timmerman's body was found floating in the southern portion of Oxford Lake that lies within the boundaries of the Manistee National Forest.

Prior to trial defendant filed a motion to dismiss the indictment for lack of subject matter jurisdiction. Defendant's primary argument was that government did not have exclusive jurisdiction over the "waters" of Oxford Lake as required by 18 U.S.C. § 7(1). Defendant argued in the alternative that federal jurisdiction over the waters could not be predicated on 18 U.S.C. § 7(3), because that section applied only to "lands."

The government responded that it was asserting concurrent jurisdiction under § 7(3) which defines the special maritime and territorial jurisdiction of the United States to include "any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof." 18 U.S.C. § 7(3). The Court determined the government's ownership of the bed of the southern one-third of Oxford Lake that was within the Manistee National Forest was sufficient to confer jurisdiction under § 7(3) over crimes occurring in the space immediately above the bed. At trial the government proved that the victim's body was found in the southern portion of Oxford Lake within the boundaries of the Manistee National Forest.

When the Sixth Circuit first raised the issue of subject matter jurisdiction, it requested the parties to brief issues primarily relating to the notice provisions of 40 U.S.C. § 255.[2] Prior to briefing these issues the case was remanded to this Court pursuant to the parties' stipulation for further development of the record on subject matter jurisdiction.

The parties' briefings in this Court have gone beyond the limited inquiry into the notice provisions of 40 U.S.C. § 255. They have focused on the manner in which the United States acquired the property that comprises the Manistee National Forest, and the United States' policies regarding the acquisition of jurisdiction over national forest land. An evidentiary hearing was held on July 21, 2006. This opinion reflects the Court's findings of fact and conclusions of law.

---

[2]The Sixth Circuit requested the parties to brief the following issues:

(1) Does the government concede that the notice referred to in 40 U.S.C. § 255 has not been filed with respect to the Manistee National Forest?

(2) If no notice has been filed establishing jurisdiction, does this Court and the court below have subject matter jurisdiction over this federal capital case?

(3) Does *Adams v. United States*, 319 U.S. 312 (1942), control the disposition of the issue, or does subsequent legislation or case law from the Supreme Court alter the holding of that case?

(4) Does § 255 apply retroactively to interests acquired before the enactment of the statute?

(5) Does any Michigan statute provide a grant of law enforcement authority to the federal government over Manistee National Forest?

(6) Any other information or argument relevant to this issue of jurisdiction.

(6th Cir. Order of March 6, 2006).

3

## II.

Understanding the jurisdictional issues in this case requires an understanding of the nature of federal jurisdiction over lands acquired from the states and the state and federal statutes relating to the national forest system.

The United States Constitution gives Congress the power "to exercise exclusive Legislation" over "all Places purchased by the consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. CONST. art. I, § 8, cl. 17. Exclusive legislation is understood as exclusive jurisdiction. *James v. Dravo Contracting Co.*, 302 U.S. 134, 141 (1937). "If lands are otherwise acquired, and jurisdiction is ceded by the state to the United States, the terms of the cession, to the extent that they may lawfully be prescribed, that is, consistently with the carrying out of the purpose of the acquisition, determine the extent of the federal jurisdiction." *Id.* at 142. If the United States obtains lands without the state's consent, the United States does not obtain jurisdiction over the land, and its possession is simply that of an ordinary proprietor. *Paul v. United States*, 371 U.S. 245, 264 (1963). Accordingly, when the United States acquires land from the states, the extent of its jurisdiction over that land can differ in scope, ranging from exclusive, to concurrent, to partial, to none. Thus, in order to determine the extent of federal jurisdiction over a particular parcel, the Court must consider the nature of the property acquired by the United States, the nature of the jurisdiction ceded by the state and the nature of the jurisdiction accepted by the United States.

The Weeks Act of 1911 authorized the United States to acquire land for purposes of establishing national forests. 16 U.S.C. § 475. A prerequisite to acquisition of national forest land in a particular state was the state's adoption of a statute consenting to federal acquisition of such

lands. 16 U.S.C. § 515. The Weeks Act also addressed the issue of civil and criminal jurisdiction within the national forests:

> The jurisdiction, both civil and criminal, over persons within national forests shall not be affected or changed by reason of their existence, except so far as the punishment of offenses against the United States therein is concerned; the intent and meaning of this provision being that **the State** wherein any such national forest is situated **shall not**, by reason of the establishment thereof, **lose its jurisdiction**, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.

16 U.S.C. § 480 (emphasis added).

Defendant contends the language of the Weeks Act indicates that the United States has always declined to accept jurisdiction over lands obtained from the states for the national forests. In support of this contention Defendant cites cases which have noted that the states retain civil and criminal jurisdiction over national forest lands. *See*, *e.g.*, *United States v. County of Fresno*, 429 U.S. 452, 455 (1977) ("Pursuant to 16 U.S.C. § 480 , the States retain civil and criminal jurisdiction over the national forests notwithstanding the fact that the national forests are owned by the Federal Government."); *Bilderback v. United States*, 558 F. Supp. 903, 906 (D.C. Or. 1982) (holding that § 480 provides that "the states retain civil and criminal jurisdiction over the national forests."). None of the cases cited by Defendant indicate that the state's jurisdiction was exclusive, or that the federal government could not have concurrent jurisdiction.

A state's retention of jurisdiction is not inconsistent with the federal government's exercise of concurrent jurisdiction. The Weeks Act's requirement that the state retain jurisdiction prohibits the United States from acquiring exclusive jurisdiction over national forest lands. It does not, however, prohibit the United States from acquiring concurrent jurisdiction. As noted by the Fourth Circuit, the language of § 480 is not inconsistent with the federal government's assumption of

concurrent jurisdiction over the national forests. This language "means only that the mere establishment of the forest does not alter the jurisdictional status of the land. It does not in any way preclude state and federal governments from entering into a relationship of concurrent jurisdiction." *United States v. Raffield*, 82 F.3d 611, 613 (4th Cir. 1996). In order for the United States to obtain jurisdiction over national forest lands, "both the state and federal governments [must] agree to the transfer" of jurisdiction." *Id.* at 612 (quoting *United States v. Johnson*, 994 F.2d 980, 984 (2nd Cir. 1993)).

Defendant has cited a 1942 USDA Solicitor's opinion for the proposition that 16 U.S.C. § 480 "precluded the exercise of concurrent jurisdiction as well as exclusive jurisdiction by the United States over national forest lands, prior to February 1, 1940." USDA Solicitor's Op. No. 4311, July 18, 1942 (Def. Ex. B).

The opinion expressed in the Solicitor's opinion is not binding, and it has been refuted by subsequent case law. For example, in *Raffield*, the Fourth Circuit held that § 480 "does not in any way preclude state and federal governments from entering into a relationship of concurrent jurisdiction." 82 F.3d at 613. *See also Wilson v. Cook*, 327 U.S. 474, 487 (1946) (explaining that by enacting § 480, "Congress in effect has declined to accept exclusive legislative jurisdiction over forest reserve lands.")

In 1923 Michigan passed an act to enable the federal government to acquire land for national forests.[3] The act provided that the state would retain concurrent jurisdiction over such lands:

---

[3]The preamble to the state act provides:

AN ACT to empower the United States of America to acquire lands in the state of Michigan by purchase or otherwise for establishing, consolidating, and extending national and state forests; to grant to the United States of America all rights necessary

> Sec. 1. That the consent of the state of Michigan be and is hereby given to the acquisition by the United States, by purchase, gift, or condemnation with adequate compensation, of such lands in Michigan as in the opinion of the federal government may be needed for the establishment, consolidation and extension of national forests in the state: Provided, That the state of Michigan shall retain a **concurrent jurisdiction** with the United States in and over lands so acquired so far that civil process in all cases, and such criminal process as may issue under the authority of the state of Michigan against any person charged with the commission of any crime without or within said jurisdiction, may be executed thereon in like manner as if this act had not been passed.

M.C.L. § 3.401 (emphasis added). The Michigan legislature specifically authorized the Congress of the United States to also exercise civil and criminal jurisdiction over the national forest lands:

> Sec. 2. Power is hereby conferred upon the congress of the United States to pass such laws and to make or provide for the making of such rules and regulations, of both a civil and criminal nature, and provide punishment therefor, as in its judgment may be necessary for the administration, control, and protection of such lands as may be from time to time acquired by the United States under the provisions of this act.

M.C.L. § 3.402.

Defendant contends that the State only ceded such criminal jurisdiction as would be "necessary for the administration, control and protection of such lands," and that the pursuit of a murder prosecution does not fall within the limited grant of such jurisdiction as would be necessary for the protection of the federal government's property interests.

The Court is not persuaded by Defendant's narrow reading of the statute. The state's grant of concurrent jurisdiction to the United States, as reflected in the 1923 legislation, is a broad grant. Nothing in the language of the statute suggests that the State intended to reserve for itself the

---

> for the proper control and administration of lands so acquired; and to authorize cooperative agreements between the state of Michigan and the United States for the acquisition, management, and operation of public forest lands.

P.A.1923, No. 312, Eff. Aug. 30, 1923, amended by P.A.1935, No. 216, Eff. Sept. 21, 1935.

authority to second guess the United States as to what prosecutions it might consider necessary for the administration, control and protection of the national forest lands. The Court is satisfied that Michigan ceded concurrent jurisdiction to the federal government over national forest lands.[4] The Court is also satisfied that the cession of concurrent jurisdiction is sufficiently broad to include the authority to prosecute murders committed on such lands.

Defendant asserts that even if the Michigan statute can be construed as a cession of concurrent jurisdiction to the federal government, that the federal government never accepted that jurisdiction.

The United States' jurisdiction over a particular parcel of property is determined at the time the property is acquired. The government has provided ample case law to demonstrate that prior to 1940 the acceptance of jurisdiction by the federal government was presumed absent any evidence of dissent on the part of the United States. *See Silas Mason Co. v. Tax Comm'n of State of Washington* 302 U.S. 186, 207 (1937) ("Acceptance may be presumed in the absence of evidence of a contrary intent"); *Dravo Contracting*, 302 U.S. at 147-49 (concluding jurisdictional analysis having only examined state statute); *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 528 (1885) ("as it conferred a benefit, the acceptance of the act is to be presumed in the absence of any dissent on their part."). "It is the established rule that a grant of jurisdiction by a State to the Federal Government need not be accepted and that a refusal to accept may be proved by evidence." *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 373 (1964). *See also United States v. Cassidy*, 571 F.2d 534, 536 (10th Cir. 1978) ("Prior to the 1940 amendment, acceptance of jurisdiction over lands

---

[4]The Forest Service has also noted that "[t]here appears to be concurrent jurisdiction legislation on most National Forest System lands in Region 9 [which includes the Manistee National Forest], except for New York." (Pl. Ex. 6, U.S.F.S. Eastern Region Law Enforcement Plan at 27).

acquired by the United States was presumed in the absence of evidence to the contrary."); *United States v. Johnson*, 426 F.2d 1112, 1114-15 (7th Cir. 1970) ("We read 40 U.S.C. § 255 as clearly requiring notice of acceptance of jurisdiction only on those cases where, prior to the passage of Section 255, jurisdiction had not yet been obtained."); *Markham v. United States*, 215 F.2d 56, 58 (4th Cir. 1954) (acceptance of jurisdiction over army base acquired in 1919 was presumed under the law then applicable, and § 255 had no application to it). This presumption is also recognized in the Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas within the States, offered as evidence by Defendant:

> Prior to the 1940 amendment to R.S. 355, however, it was not essential that the consent of the Federal Government be expressed formally or in accordance with any prescribed procedure. Instead, it was presumed that the Federal Government accepted the benefits of a State enactment providing for the transfer of legislative jurisdiction. . . . [O]nce a State legislatively indicated a willingness to transfer exclusive jurisdiction such jurisdiction passed automatically to the Federal Government without any action having to be taken by the United States. However, the presumption would not operate where Federal action was taken demonstrating dissent from the acceptance of preoffered jurisdiction.

REP. ON JURIS., Pt. II, at 49-50. There can be no dispute that prior to 1940, acceptance of jurisdiction was presumed and occurred by operation of law.

Cases have required a clear and affirmative act relating to the particular location over which jurisdiction is asserted, and taken contemporaneously with the acquisition of the property in question, to support a finding that the federal government rejected a state's cession of jurisdiction. The only exception to acceptance by the United States of jurisdiction offered by the states were cases where the federal government "plainly indicated, by legislation or by action of the executive agency concerned, that the jurisdiction proffered by the state consent statute was not accepted." REP. ON JURIS., Pt. I, at 8. A sufficient non-acceptance of jurisdiction is illustrated by *Silas Mason Co.*,

9

where the Supreme Court found that the federal intent not to accept jurisdiction had been clearly shown where the federal officials understood that State law would apply to the site of the Grand Coulee Dam, this understanding was incorporated into federal contracts, and Congress expressly ratified those contracts. 302 U.S. at 208. *See also Humble Pipe Line*, 376 U.S. at 373-74 (declining to infer a rejection of acceptance of jurisdiction in the absence of an affirmative act by the United States).

The presumption changed in 1940. Effective February 1, 1940, Congress changed the presumption of acceptance of jurisdiction by the United States to a presumption of non-acceptance in the absence of a notice of acceptance:

> Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and **indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance** with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. **Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted**.

40 U.S.C. § 255 (emphasis added) (now rewritten and codified at 40 U.S.C. § 3111 and 3112). As noted by the Supreme Court, the Act

> resulted from a cooperative study by government officials, and was aimed at giving broad discretion to the various agencies in order that they might obtain only the necessary jurisdiction. The Act created a definite method of acceptance of jurisdiction so that all persons could know whether the government had obtained 'no jurisdiction at all, or partial jurisdiction, or exclusive jurisdiction.'

*Adams v. United States*, 319 U.S. 312, 314 (1943).

"Since 1940 Congress has required the United States to assent to the transfer of jurisdiction over the property, however it may be acquired." *Paul*, 371 U.S. at 264 (citing 40 U.S.C. § 255). The enactment of § 255 represented a major change in federal policy. One of the purposes of § 255 was "to make the acquisition of jurisdiction by the Federal Government the exception rather than the general rule." USDA Solicitor Op. No. 2979, Dec. 18, 1940 (Def. Ex. A).

One of the questions posed by the Sixth Circuit was whether § 255 applies retroactively to interests acquired before the enactment of the statute. A statute will only be found to operate retroactively where it contains a clear statement to that effect. *INS v. St. Cyr.*, 533 U.S. 289, 316 (2001). There is no language in § 255, much less any clear statement, that would suggest that Congress intended the provision to apply retroactively. In fact, § 255 provides that the presumption that no jurisdiction has been accepted in the absence of notice applies only to "lands hereafter to be acquired." 40 U.S.C. § 255. Accordingly, by its express terms, the presumption in § 255 has prospective application only.

Although the Supreme Court has not addressed the retroactivity of 40 U.S.C. § 255, and although Defendant does not concede the point, it is well established that the notice requirement does not apply to lands acquired before 1940. Those federal courts that have considered the issue have uniformly held that with respect to lands acquired by the United States prior to 1940, the presumption that jurisdiction was accepted remains, unless rebutted by some other evidence. *See*, *United States v. Cassidy*, 571 F.2d 534, 537 (10th Cir. 1978) ("the courts have consistently held that for land acquired by the United States prior to 1940, the presumption that jurisdiction was accepted remains."); *Johnson*, 426 F.2d at 1115 ("The presumption against the acceptance of jurisdiction in

that statute [40 U.S.C. § 255] is applicable only to land acquired subsequent to the 1940 amendment."); *Markham*, 215 F.2d at 58 (holding that § 255 "applies only to lands thereafter to be acquired").

A USDA solicitor's opinion issued close in time to the enactment of § 255 is consistent with the federal court opinions cited above:

> [I]t is not necessary to take steps to obtain jurisdiction from the State over lands acquired under the Weeks Act before February 1, 1940. The amendment does not alter the jurisdiction of the Federal Government, or of the States, over lands acquired before February 1, 1940, but such jurisdiction, if any, as was obtained by the Government when the lands were acquired, by virtue of the laws of the United States and the State consent and cession statutes that were then in effect, remains undisturbed.

USDA Solicitor's Op. No. 2979 at 2, December 18, 1940 (Def. Ex. 3). The United States Forest Service shares the understanding that § 255 is not retroactive:

> Thus, for land acquired prior to February 1, 1940, acceptance of jurisdiction by the United States is presumed in the absence of evidence of a contrary intent on the part of the acquiring agency or Congress. Since 1940, the United States acquires no jurisdiction over Federal lands in a State until the head of the department or agency, which has custody of the land, formally accepts jurisdiction for the United States.
>
> It is important to keep in mind that National Forest System lands acquired prior to February 1, 1940, may fall under the Special Maritime and Territorial Jurisdiction provision of 18 U.S.C. 7. Therefore, concurrent jurisdiction may already exist on these lands; providing that the particular State ceded criminal jurisdiction of the parcel in question prior to its acquisition by the Federal government.

USFS Eastern Region Law Enforcement Plan 2004 at 28 (Pl. Ex. 6).

The National Forests are divided into the Western Region (Regions 1 through 6), the Eastern Region (Regions 8 and 9) and the Alaska Region (Region 10). (Pl. Ex. 3). Most of the National Forest System lands with concurrent jurisdiction are found in Regions 8 and 9. USFS Law

Enforcement Student Guide (1993) at 17 (Pl. Ex. 7, ).[5]  The Manistee National Forest is located in Region 9.  The Manistee National Forest consists of numerous separately acquired parcels, some acquired before 1940 and some acquired after 1940.  (Def. Ex. S, Ex. T).  The parties have stipulated and agreed that the United States does not possess records of notice filings pursuant to 40 U.S.C. § 255 for the Manistee National Forest, and that in the absence of records reflecting that such notice has been given, it must be conclusively presumed at this time that no jurisdiction was accepted for those parcels of the Manistee National Forest that were acquired after February 1, 1940.  (Docket # 710).

The particular 80-acre parcel of the Manistee National Forest that includes the southern portion of Oxford Lake where Timmerman's body was found (the "Oxford Lake parcel," also known as parcel 25, or the Hoffman parcel), was acquired by the United States in 1939.  (Pl. Ex. 1 & 2).  Accordingly, the particular parcel where the body was found was not subject to the notice requirements of § 255.  Instead, the United States' acceptance of jurisdiction with respect to the Oxford Lake parcel was presumed, absent evidence to the contrary.

---

[5] The 1993 Student Guide explains that in most cases, 18 U.S.C. § 7 applies to national forest lands acquired by general purchase, exchange, or donation prior to February 1, 1940, and as a result, concurrent jurisdiction can attach to these lands.  It further explains that concurrent jurisdiction does not apply to most of the national forest lands in the Western Region because lands reserved from the public domain or that never left federal ownership do not fall within the scope of 18 U.S.C. § 7.  (Pl. Ex. 7 at 17).  Defendant has asserted that the 1993 Student Guide is not consistent with the 1992 Student Guide because the 1992 Student Guide notes that nearly all the national forest system land is held in a proprietorial capacity and accordingly does not fall within the scope of 18 U.S.C. § 7.  (Def. Ex. X at 27 & 31).  The two Student Guides are not inconsistent.  They merely illustrate the difference between the manner in which the Eastern and Western Region forest lands were acquired and the fact that the vast majority of national forest lands are found in the western region.  *See* (Pl. Ex. 3, USFS National and Regional Areas Summary).

The Sixth Circuit has questioned the applicability of *Adams*, 319 U.S. 312, to the jurisdictional issue in this case. In *Adams* the Supreme Court held that the district court did not have jurisdiction to prosecute soldiers for rape committed on an army base because the base had not filed notice of acceptance of federal jurisdiction pursuant to 40 U.S.C. § 255. In *Adams* the Court specifically noted that 40 U.S.C. § 255 had been passed prior to the acquisition of the land on which the base was located. *Id.* Unlike the property at issue in *Adams*, the Oxford Lake parcel on which Timmerman's body was found was acquired by the United States prior to the passage of § 255. Because the Oxford Lake parcel was acquired before the effective date of § 255, the notice requirements of § 255 do not apply to the Oxford Lake parcel, and *Adams* does not control the disposition of the jurisdictional issue in this case.

Defendant does not dispute the fact that acceptance of jurisdiction was presumed prior to 1940 in the absence of evidence to the contrary. Neither has Defendant presented any evidence demonstrating that jurisdiction was declined at the time the Oxford Lake parcel was acquired for the Manistee National Forest in 1939. Instead, Defendant asserts that the pre-1940 presumption of acceptance of jurisdiction is rebutted by evidence that the United States has always intended to maintain only a proprietorial interest over the Manistee National Forest. Defendant's evidence consists solely of policies adopted and actions taken by the United States after 1940.

For example, in a 1940 opinion the USDA Solicitor suggested that "it is seldom, if ever, necessary for the Federal Government to acquire any jurisdiction, exclusive or partial, from the States in order to carry out the purposes for which lands are acquired." USDA Solicitor Op. No. 2979 at 9667, Dec. 18, 1940 (Def. Ex. A). In a 1943 Opinion the USDA Solicitor opined that "the United States does not have either exclusive or concurrent legislative jurisdiction over national

14

forests and does not need such jurisdiction to protect them.  National forest lands are, therefore, held by the United States in its proprietary capacity."  USDA Solicitor Op. No. 4658 at 15948, April 27, 1943 (Def. Ex. C).

In the early 1950s, after recognizing that laws and practices relating to federal legislative jurisdiction varied from state to state and from agency to agency without an apparent basis, a committee was formed to study the jurisdictional status of federal lands.  In April 1956 and June 1957 the committee submitted to the Attorney General and the President its REPORT OF THE INTERDEPARTMENTAL COMMITTEE FOR THE STUDY OF JURISDICTION OVER FEDERAL AREAS WITHIN THE STATES, PARTS I & II, U.S. Government Printing Office 1956 & 1957 (Def. Ex. D &E).  The report gave a general overview of federal legislative jurisdiction and agency preferences and concluded that the federal government had acquired and retained too much legislative jurisdiction over the years.  REP. ON JURIS., Pt. I at 69.  The report noted that the USDA preferred a proprietorial interest only in the property under its control.  *Id.* at 34, 64.  However, the Report also noted that lands were often held with more jurisdiction in the United States than was considered best by the federal agency concerned.  *Id.* at 34.  The report also indicated that "[t]he Forest Service of the Department of Agriculture . . . in accordance with a provision of Federal law (16 U.S.C. 480), has not accepted the jurisdiction proffered by the statutes of many States, and the vast majority of Federal forest lands are held by the Federal Government in a proprietorial status only."  REP. ON JURIS., part II, at 114.

In 1962 the General Services Administration compiled an INVENTORY REPORT ON JURISDICTION STATUS OF FEDERAL AREAS WITHIN THE STATES. (Def. Ex. G).  The Inventory Report assigns the lower Michigan National Forest, which includes the Manistee National Forest in

15

Newaygo County, a jurisdictional Code of 4, which is described in the report as "Proprietorial Interest Only." *Id.* at 389 & 391.

Defendant has also submitted two letters from an attorney in the USDA General Counsels Office addressing jurisdiction over national forest land in Virginia. In his first letter the attorney recalled the following:

> 1. Concurrent jurisdiction exists in both the state and Federal Government over National forest land as to certain matters.
>
> 2. The United States has jurisdiction to prosecute criminally for damage to National forest lands or to property on National Forest land for crimes violating any section of the criminal code of the Federal Law.
>
> 3. The State has exclusive jurisdiction and the complete responsibility for the prosecution of crimes on National Forest land except those that fall within the category in the last paragraph above.

USDA Off. of Gen'l Counsel, letter of Aug. 28, 1959 (Def. Ex. F).

In a second letter the same attorney noted that "The United States has neither concurrent nor exclusive jurisdiction over National Forest lands, but holds such lands in a proprietary capacity only." He further noted that "In no case where national forest lands, acquired under the Weeks Law, are involved has there been jurisdiction accepted by the United States. USDA Off. of Gen'l Counsel, letter of Mar. 29, 1963 (Def. Ex. H). The conflicting advice given in these letters from the same government attorney only increases this Court's reluctance to give them much weight.

In a letter dated May 15, 1969, the Under Secretary of the USDA stated that it was the USDA's preference not to obtain exclusive, partial, or concurrent legislative jurisdiction, and that the USDA had long recommended that all lands administered by the USDA be held in a proprietorial capacity. The letter also noted that it was the position of the USDA that federal agencies should

16

have the authority to retrocede all or any of the federal government's nonproprietorial jurisdiction to the states, and that all land within a particular federal installation should be held in a uniform jurisdictional status "to eliminate the constant problem of law enforcements which results from holding land in a mixed jurisdictional status." (Def. Ex. I)

Defendant's citation to post-1940 secondary sources is not sufficient to show that the government rejected jurisdiction over the Oxford Lake parcel when it was acquired in 1939. The secondary sources tend to confirm that the jurisdictional status of federal lands was not uniform and that it created difficulties for the various agencies responsible for the administration of federal lands. The secondary authorities confirm that there was a shift in the government's position with respect to federal jurisdiction in 1940, and a growing understanding that legislative jurisdiction was neither necessary nor useful to the administration of federal forest lands. The secondary sources confirm that as of December 1940, the USDA was of the position that federal jurisdiction should not be accepted in the future, and that as of 1969 the USDA took the position that agencies should have authority to relinquish federal jurisdiction where it existed. Although the secondary sources reveal that the USDA questioned the existence of concurrent legislative jurisdiction over national forest lands, none of the secondary sources specifically addressed the jurisdictional status of the Manistee National Forest or the Oxford Lake parcel in particular. What the secondary sources fail to show is that Congress or the USDA decided not to accept jurisdiction or that it did anything to demonstrate that it was declining to accept jurisdiction when the Oxford Lake parcel was acquired.

Defendant also contends that the federal government's failure to give the § 255 notice with respect to the adjoining parcels in the Manistee National Forest that were acquired after 1940 reflects on the intent of the United States with regard to the Oxford Lake parcel that was acquired in 1939.

The USDA's post-1940 decision not to accept jurisdiction over parcels acquired in the future does not qualify as a clear expression of the agency's position in 1939 when it acquired the property. As previously noted, there was a change in policy that prompted the passage of the 1940 act.

Defendant has no evidence of the position of the USDA with respect to accepting jurisdiction at the time the Oxford Lake parcel was acquired. Neither does Defendant have any evidence of any action taken by the USDA to decline jurisdiction of the Oxford Lake parcel. The post-1940 statements from the USDA are not sufficient to rebut a presumption that jurisdiction over the Oxford Lake parcel was accepted by the United States.

Once the federal government accepts concurrent jurisdiction over a parcel of property, it cannot relinquish that acceptance of jurisdiction without an act of Congress. Relinquishment of jurisdiction is known as retrocession. As noted in the 1957 Report on Jurisdiction on which Defendant places substantial reliance, "while Federal law gives authority . . . to Federal administrators to acquire jurisdiction, it do[e]s not . . . give them like authority to dispose of jurisdiction once it is acquired." REP. ON JURIS., Pt. 1, at 36. There is no evidence that Congress has expressly authorized the retrocession of jurisdiction with respect to the Oxford Lake parcel at issue in this case or over all forest lands that were acquired prior to enactment of § 255 in 1940.

Defendant suggests that it would not make sense to treat the various parcels of the Manistee National Forest differently with respect to jurisdiction. Although Defendant's desire for uniformity is reasonable, Defendant has not presented the Court with any authority that would suggest that the Court should consider jurisdiction over the forest as a whole rather than according to the jurisdictional status of the individual parcels when they were acquired. In the years since national forest lands were first acquired by the United States, Congress could have taken action to ensure

uniform jurisdiction over all national forest land across the nation, or over all parcels within individual forests. Congress has not done so. In the absence of legislation to this effect, this Court is required to determine federal legislative jurisdiction over each parcel at the time it was acquired.

### III.

In summary, the Court concludes that the Weeks Act permitted the Untied States to obtain concurrent jurisdiction over national forest lands; that the State of Michigan granted concurrent jurisdiction to the United States over national forest lands; that the Oxford Lake Parcel on which Timmerman's body was found was acquired by the United States in 1939; that acceptance of jurisdiction by the United States over property acquired before 1940 was presumed; that there was no affirmative act at the time the property was acquired that would suggest that the United States rejected jurisdiction; and that there has been no affirmative act subsequent to the United States's acquisition of the property sufficient to constitute retrocesssion of jurisdiction. Accordingly, the Court finds that the United States had jurisdiction to prosecute crimes occurring on the Oxford Lake parcel of the Manistee National Forest.

An order consistent with this opinion will be entered.

Date:     August 25, 2006           /s/ Robert Holmes Bell
                                    ROBERT HOLMES BELL
                                    CHIEF UNITED STATES DISTRICT JUDGE